UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at PIKEVILLE

| | |
|---|---|
| **Willie Ousley** *on behalf of the estate of Patricia L. Ousley*<br>      *Plaintiff;*<br><br>      *v.*<br><br>**CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY,**<br>      *Defendant.* | )<br>)<br>)<br>)<br>)   No. 16-cv-00064-ART<br>)<br>)<br>)<br>)<br>) |

### RESPONSE TO COMMISSIONER'S MOTION TO DISMISS

### FACTS AND BACKGROUND

As a threshold matter, as the Court is well aware, when considering the facts relevant to a motion to dismiss, the Court and the parties must be careful to limit their analysis to the Complaint's well-pled facts and only such other documents as are incorporated into the Complaint or publicly available and proper for judicial notice. *See Nevada-Martinez v. Amhad*, No. 5:15-cv-239-JMH, 2016 WL 1559426, at *2 (E.D. Ky. April 15, 2016)

Mr. Ousley mentions this because the Defendant has attached documents to her Motion to Dismiss that should not be considered. In specific, Mr. Ousley objects to consideration at the motion-to-dismiss phase of:

- the Declaration of Kelly Salzman

- the May 12, 2015 Memorandum from David F. Black to Helen L. Cooper

1

Neither of these documents is referred to, much less incorporated into, Mr. Ousley's Complaint. Accordingly, they must be ignored.

As a result, the Defendant's summary of facts must be scrutinized carefully to ensure that the Court does not inadvertently consider facts that it should not at this phase of the case. For example, on the last paragraph of page 4 (and carrying over to page 5) of the Memorandum in Support of Acting Commissioner's Motion to Dismiss, the Defendant refers to facts related to the May 12, 2016 Memorandum by relying on the Salzman Declaration and the Memorandum. Such factual representations must be disregarded.

As the Complaint provides, Willie Ousley on behalf of the estate of Patricia L. Ousley was a disabled individual from Floyd County, Kentucky.

On September 2, 2010, an ALJ with Social Security Administration approved Mrs. Ousley's claims for benefits under Title II (social security disability) of the Social Security Act.

Nearly eight years later, the Social Security Administration's Appeals Council wrote to Mrs. Ousley and provided her with a notice that alleged that the Social Security Administration's Office of the Inspector General said that it has reason to believe fraud was involved in cases like Mrs. Ousley's in which attorney Eric C. Conn submitted evidence by four named doctors, including Dr. David Herr.

As a result of this notice, Mr. Ousley had to undergo a "redetermination" hearing to determine whether another ALJ would find that the evidence (other than Dr. Herr's report) was sufficient to prove that Mrs. Ousley was disabled on September 2, 2010. *Id.* (referring to Appeals Council remand order).

The actions of the defendant are premised on the unproven allegation, that there was fraud or similar conduct. There is no evidence of record in the administrative proceeding that supports such a finding."

The ALJ who performed the redetermination hearing denied Mr. Ousley's claim, finding that when Dr. Herr's report is ignored, that there was not sufficient evidence to support Mrs. Ousley's disability as of September 2, 2010.

Mr. Ousley appealed this decision to the Appeals Council, which summarily denied review on March 7, 2016.

Having exhausted his administrative remedies, Mr. Ousley filed the present action on May 9, 2016.  *See id.*

On July 7, 2016 the Defendant filed a Rule 12(b)(6) motion to dismiss.  The Defendant essentially seeks dismissal of Mr. Ousley's procedural challenges.  (The Defendant refers to these as "Counts Four and Five" although Mr. Ousley did not designate them so.)

## ARGUMENT

A court evaluating a Rule 12(b)(6) motion to dismiss determines whether the complaint, construed in the light most favorable to the plaintiff, contains sufficient factual matter to state a plausible claim. *See Jackson v. Sedgwick Claims Mgmt. Servs.*, 731 F.3d 556 (6th Cir. 2013) (en banc).  Determining plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). *Iqbal* expressly disavows a return to the days of code-pleading and instructs courts to make "reasonable inference[s]" based upon the well-pled facts. *Id.* at 678.

Here, Defendant moves to dismiss Mr. Ousley's procedural challenges because it claims that it properly redetermined Mr. Ousley's application for benefits in accordance with section

3

205(u) of the Social Security Act, and the Act's regulations governing reopenings are not applicable to redeterminations. *See* R.15, Motion to Dismiss, Page ID #186–97. Defendant points to legislative history of the Act to argue that Congress intended there to be a distinction between redeterminations and reopenings. *Id.* at 7-8 (citing Report on Reforms to Address Supplemental Security Income Fraud and Abuse Involving Middlemen at 7 (May 12, 1994), http://congressional.proquest.com/congressional/docview/t21.d22.cmp-1994-wam-0010?accountid=14740 [hereinafter Rept. on Reforms]). However, the report that Defendant relies upon in fact demonstrates that Congress intended reopening procedures to apply when there is reason to believe that an application or supporting documents are fraudulent. In the report, the Subcommittee on Oversight of the House Committee on Ways and Means states:

> The Social Security Act should be amended to require that the HHS OIG make SSI 'recipient identifying information' available to SSA as soon as it is known and **to require that SSA immediately proceed administratively to reopen** SSI cases where there is reason to believe that an application or supporting documents are fraudulent, unless it is determined . . . that making the identifying information available to SSA or **proceeding with administrative reopening** of those cases, would substantially jeopardize the criminal prosecution of one or more of the parties involved in the related fraudulent scheme.
>
> 4. ***Reopening SSI cases*** *Where Fraud is Suspected*
>
> The Social Security Act should be amended to clarify **SSA's authority to reopen** SSI cases where there is reason to believe an application or supporting documents are fraudulent.

Rept. on Reforms at 8 (emphasis added). These passages explain the legislative intent behind 42 U.S.C. § 405(u) and 42 U.S.C. § 1320a-8(l), the statutes under which Defendant redetermined Mrs. Ousley's application. Rather than create a new procedure

4

when fraud is suspected, Congress intended to require the SSA to follow reopening procedures. Because Mr. Ousley's complaint sets out facts which show that Defendant failed to follow reopening procedures when it redetermined his application for benefits, the complaint states a claim on which relief may be granted.

<u>Mr. Ousley's Due Process Rights Have Been Violated</u>

The federal government cannot constitutionally deprive a person of the benefits that their family depends on based on a secret document containing allegations of fraud.

As the Supreme Court explained in *Goldberg v. Kelly*, 397 U.S. 254, 270 (1970), before the government can cut off an individual's benefits, certain procedures must be followed to comply with due process. "[W]here governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." *Id.* (quoting *Greene v. McElroy*, 360 U.S. 496 (1959). This disclosure is important because "due process requires an opportunity to confront and cross-examine adverse witnesses." *Id.*

In Mr. Ousley's case, even at this point, the Defendant has not disclosed what evidence proves that there is in fact reason to believe that fraud was involved in Mrs. Ousley's 2010 award of benefits. Because it has not been disclosed, Mr. Ousley has not had the opportunity to challenge the credibility of this evidence.

In addition, Mr. Ousley has not been given a legal opportunity to challenge the (unsupported) allegations of fraud until now. The Appeals Council's May 18, 2015 notice that began the redetermination process for Mr. Ousley, summarily accepted the allegation that "there

5

was reason to believe fraud was involved," and it has been insulated from review in Mr. Ousley's claim until now.

Even though the bottom-line holding of *Mathews v. Elridge*, 424 U.S. 319 (1976), was that Title II Social Security disability claimants do not have a constitutional right to a full evidentiary hearing before termination of benefits, *Matthews* does not stand in the way of Mr. Ousley's procedural argument.

This Court should hold that the Defendant's decision in Mr. Ousley's claim to withhold whatever evidence might support the allegations of fraud and to prohibit Mr. Ousley from being able to challenge these allegations violates his due process rights when the process results in the loss of his disability benefits.

The Redetermination Process Violated the Administrative Procedure Act

While the constitutional violation in Mr. Ousley's case is the most straightforward showing of likelihood of success on the merits, out of respect for the practice of constitutional avoidance, Mr. Ousley can also show that he is likely to succeed on statutory challenges to the Defendant's actions in this case.

The Defendant's procedures violated Mr. Ousley's rights under the Administrative Procedure Act ("APA.")

> *Mr. Ousley's Record Lacks Any Finding of Fraud and Mr. Ousley Has Been Deprived of Any Opportunity to Defend his Case by Challenging This Presumed Fact.*

The first APA violation relates to the Defendant's due process violation. The Defendant's action in relying on extra record allegations of fraud and refusing to allow Mr. Ousley to rebut such evidence using methods such as cross examination violates the requirements on formal adjudication at 5 U.S.C. § 556(d)–(e). In all of the estimated 1500 hearings, the plaintiff and others are admonished that the hearing officer will "disregard" all evidence from any of the four

6

suspect doctors. Hence, there exists no chance to ever challenge the fraud finding under the rules enacted by the SSA, and strictly enforced by the hearing officers. The concept of unchallengeable evidence is not only violative of SSA rules but runs afoul of our constitution. To date the secret O.I.G. report has never been made public, nor have any of the thousand plus former Conn clients been able to challenge the fraud allegations, that has affected all of their hearings in a material manner.

As a threshold matter, Mr. Ousley's oral redetermination hearing should be considered a required formal adjudication under the APA. *Cf. Califano v. Yamasaki*, 442 U.S. 682, 697 (1979) (holding that SSA must provide oral hearing before determining whether claimant was at fault for overpayment).

5 U.S.C. § 556(d) says, "A party is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts."

The Defendant has not complied with this provision because Mr. Ousley has not been allowed to present his defense against the allegations of fraud and has not been allowed to cross examine whomever the sources of the fraud allegations are.[1]

5 U.S.C. § 556(e) says,

> The transcript of testimony and exhibits, together with all papers and

---

[1] If there is any other information from SSA that the ALJ's decision rested on, this would violate the APA's prohibition on *ex parte* communication. *See* 5 U.S.C. 557(d)(1).
However, the basis of the allegations of fraud were never a part of the testimony and exhibits in Mr. Ousley's adjudication below. All Mr. Ousley received was the May 18, 2015 notice of the Defendant's subordinates' conclusion that "there was reason to believe fraud was involved." There is nothing in the record to support the Appeals Council's conclusion that there is reason to believe fraud was involved in Mr. Ousley's award. Further, § 556(e) requires Mr. Ousley have "an opportunity to show the contrary." However, the Defendant has never provided this opportunity and accordingly violated the APA.

7

requests filed in the proceeding, constitutes the exclusive record for decision in accordance with section 557 of this title and, on payment of lawfully prescribed costs, shall be made available to the parties. When an agency decision rests on official notice of a material fact not appearing in the evidence in the record, a party is entitled, on timely request, to an opportunity to show the contrary.

*The ALJ's Decision in Mr. Ousley's Redetermination Decision Was Directed by Investigators or Prosecutors Within SSA.*

An additional problem under the APA is the fact that it appears that the Defendant's adjudicators are effectively being directed by investigators or prosecutors within the agency.

5 U.S.C. § 554(d) requires that the adjudicator in a formal hearing not "be responsible to or subject to the supervision or direction of an employee or agent engaged in the performance of investigative or prosecuting functions for an agency."

This provision was violated in Mr. Ousley's case from the beginning of his redetermination process. As the Appeals Council's July 2, 2015 order remanding Mr. Ousley's claim to the ALJ provided "*The Social Security's Office of Inspector General* sent your case to us. The Inspector General told us there was a reason to believe fraud was involved." The Appeals Council and the ALJ treated the Inspector General's conclusion as a proven fact, effectively resulting in the Inspector General effectively directing a portion of the adjudicators' decisions in Mr. Ousley's formal hearing.

The Inspector General performs investigative functions. As the Defendant herself states, "OIG directs, conducts, and supervises a comprehensive program of audits, evaluations, and *investigations* relating to SSA's programs and operations."

Accordingly, because the ALJ was effectively "subject to the . . . direction of an employee or agent engaged in the performance of investigative . . . functions for" the agency, the Defendant's subordinates violated 5 U.S.C. § 554(d).

*Failure to Follow Notice-and-Comment for HALLEX*

To the degree that the Defendant defends its procedures by relying on the agency's "Hearings, Appeals and Litigation Law Manual" (HALLEX) an additional problem under the APA arises. If the agency gives HALLEX the force and effect of law, then it violates 5 U.S.C. § 553's rulemaking procedures. *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015). (A failure to promulgate rules also violates the Social Security Act because 42 U.S.C. §§ 405(a) and 421(k) says that the Defendant "shall" establish formal rules to govern adjudication.)[2]

<u>The Redeterminations Violated the Social Security Act.</u>

The Defendant's procedures in Mr. Ousley's claim not only violate his constitutional and APA rights, but also his rights under the Social Security Act.

*"Immediately" from 42 U.S.C. §§ 405(u)(1)(A), 1383(e)(7)(A)(i).*

The statutory provision that allows for the Defendant to "redetermine" otherwise final awards of benefits sets an important temporal limit on when the Defendant can do so. In specific, 42 U.S.C. § 405(u)(1)(A) provides that in Title II cases:[3]

> The Commissioner of Social Security shall *immediately* redetermine the entitlement of individuals to monthly insurance benefits under this subchapter if there is reason to believe that fraud or similar fault was involved in the application of the individual for such benefits, unless a United States attorney, or equivalent State prosecutor, with jurisdiction over potential or actual related criminal cases, certifies, in writing, that there is a substantial risk that such action by the Commissioner of Social Security with regard to beneficiaries in a particular investigation would jeopardize the criminal prosecution of a person involved in a suspected fraud.

A parallel provision for Title XVI cases is at 42 U.S.C. § 1383(e)(7)(A)(i).

---

[2] As the agency describes, "Through HALLEX, the Deputy Commissioner for Disability Adjudication and Review conveys guiding principles, procedural guidance, and information to Office of Disability Adjudication and Review staff. HALLEX defines procedures for carrying out policy and provides guidance for processing and adjudication claims at the hearing, Appeals Council, and civil action levels." HALLEX I-1-0-1, https://www.ssa.gov/OP_Home/hallex/I-01/I-1-0-1.gtml (last visited July 7, 2016)

[3] The only difference in the wording is in the first sentence. Section 1383(e)(7)(A)(i) says "redetermine the *eligibility of an individual for benefit*s" rather than "entitlement of individuals to monthly insurance benefits."

9

While Mr. Ousley maintains that the Defendant has not met its burden to show sufficient reason to believe that fraud was involved in his claim, Mr. Ousley argues in the alternative that any evidence that would support such a finding existed many years before the Defendant initiated Mr. Ousley's redetermination process and thus the Defendant violated the "immediately" requirement.[4] As will be discussed, the defendant violated the "immediately" procedure of the statute by waiting more than eight years to initiate the process, this affects individuals like Mr. Ousley to go back in time and try to recreate medical evidence that is more than eight years old.

While the full timeline and supporting facts are better suited to a final, merits decision, Mr. Ousley provides the following outline of public facts for which judicial notice is appropriate to show that Mr. Ousley has a sufficient likelihood of success to warrant preliminary relief.

- **Late 2006** – Jennifer Griffith, an SSA employee in the Huntington, WV hearing office (where ALJ Daugherty worked) began reporting to supervisors that ALJ Daugherty was improperly assigning cases to himself and issuing on-the-record decisions that were favorable to the claimant. Ms. Griffith testified that "ALJ Daugherty stopped holding hearings in Prestonsburg on Mr. Conn's cases and began deciding . . . all of his cases on the

---

[4] Another statutory provision, 42 U.S.C. § 1320a-8(*l*), provides details about what the SSA's Office of Inspector General must do when it has reason to believe fraud was involved. But this provision does not mean that the Defendant can only act under §§ 405(u)(1)(A), 1383(e)(7)(A)(i) when the information is channeled through OIG, rather it simply specifies that the OIG must provide identifying information to the Defendant. The role of § 1320a-8(*l*) is to encourage prompt redetermination, not bureaucratic paralysis.

record favorably. And . . . everyone noticed that." [5] Ms. Griffith was supported in her complaints by a coworker and union representative, Sarah Carver who also complained to supervisors about improper activity between ALJ Daugherty and Eric Conn.[6] In response to these complaints, Ms. Griffith's supervisors retaliated against Ms. Griffith and Ms. Carver.[7] Due to health problems related to the stress of the retaliation, Ms. Griffith resigned in October 2007. At the time of her resignation, she cited the reason for her leaving as the "misconduct of ALJ David Daugherty" by which she was referring to "his misappropriation of the cases and deciding those favorably based on the attorneys assigned them."[8]

- **July 2009** – Ms. Griffith called SSA's Office of Inspector General to report the alleged misconduct involving ALJ Daugherty and Eric Conn.[9]

- **May 19, 2011** – *The Wall Street Journal* publishes an exposé of ALJ Daugherty, focusing on his approval of claims involving Eric Conn.[10] The article said, "the Social Security Administration's inspector general's office launched an investigation into Mr. Daugherty's approval rate" including as a subject a "possible connection between Messrs. Daugherty and Conn." The same day the article was printed, Inspector General agents went to the

---

[5] Tr. of Evidentiary Hearing 28, *Griffith v. Conn*, No. 11-cv-157 (E.D. Ky. Sept. 8, 2014) (testimony of Jennifer L. Griffith). The SSA consented to Ms. Griffith's testimony and a DOJ attorney was present at the hearing to represent the Government's interest. *Id.* at 10.
[6] *Id.* at 129–31 (testimony of Sarah Carver).
[7] *Id.* at 29 (testimony of Ms. Griffith) (stating that following Ms. Griffith's complaints, her supervisor Ms. Goforth told her that she had a "goal to get rid of me by the end of that year"); *id.* at 132 (testimony of Ms. Carver) ("I started receiving a lot of retaliation from different supervisors.").
[8] *Id.* at 34–35.
[9] *Id.* at 45.
[10] Damian Paletta, "Disability-Claim Judge Has Trouble Saying 'No': Near Perfect Approval Record; Social-Security Program Strained", *The Wall Street Journal* (May 19, 2011), http://www.wsj.com/articles/SB10001424052748704681904576319163605918524.

11

> Huntington, WV Hearing Office and began securing evidence and interviewing witnesses regarding Conn and Daugherty. During the same time frame Chief Huntington SSA Judge Charlie Andrus decided to engage in a criminal conspiracy and try to falsely accuse Sarah Carver of engaging in job related misconduct in an attempt to punish and intimidate her for reporting the allegations that led to the allegations that triggered the SSA's actions against the plaintiff and others. Andrus eventually plead guilty to a felony information for this conduct on June 14, 2016 in Federal Court in Lexington.

- **May 2011-** According to his 2016 guilty plea stipulation, beginning immediately after the publication of the Wall Street Journal article, Chief Huntington Judge Charlie Andrus entered into a criminal conspiracy with Eric Conn to retaliate against an SSA employee "for providing truthful information to law enforcement officers". The plea stipulation indicated that the conspiracy involved gathering video evidence, and that the video operation went on from June 2011, until February 2012. In the plea documents Andrus acknowledged that his administrative duties included being the supervisor of "all Huntington Hearing office employees…." Andrus also acknowledged that he was aware of the O.I.G. investigation in early 2011.

- **September 13, 2012** – The Minority Staff of the U.S. Senate Permanent Subcommittee on Investigations issued a report naming ALJ Daugherty as a judge who issued improper decisions relying on attorney-procured medical evidence. [11]

**October 7, 2013** – The U.S. Senate Committee on Homeland Security and Governmental Affairs held a hearing[12] and issued a report[13] that directly made accusations of fraud regarding

---

[11] S. Permanent Subcomm. on Investigations, Comm. on Homeland Security and Gov't Affairs, *Social Security Disability Programs: Improving the Quality of Benefit Award Decisions* (2012), *available at* http://www.hsgac.senate.gov/download/?id=C72D8A7D-F773-4E31-A84C-5B877CA11316*.*

12

attorney Eric Conn and ALJ Daugherty. The report was titled "How Some Legal, Medical, and Judicial Professionals Abused Social Security Disability Programs for the Country's Most Vulnerable: A Case Study of the Conn Law Firm." As a part of that hearing, Debra Bice, Chief Administrative Law Judge of the SSA, told the Committee that SSA had what she termed "reliable evidence" sufficient to show "similar fault" under 42 U.S.C. § 405(u) of the Social Security Act.[14]

- **July 2, 2014** – SSA's Office of the Inspector General provides the SSA's General Counsel with "information regarding 1,787 individuals" who "were formerly represented by attorney Eric C. Conn, or his firm, and OIG had reason to believe that fraud was involved in their applications for Social Security Benefits." This "referral was with the understanding that SSA was not to take any adverse action against any individual on the list until further notice." (The referral itself is not available to Mr. Ousley, but it is referred to in the May 12, 2015 Memorandum that is at R.13-1, Page ID #94.)

- **May 12, 2015** – SSA's Office of Inspector General says that it is "not aware of any objection to SSA moving forward with its administrative processing of the redeterminations of the 1,787 individuals whose name were previously provided by OIG to SSA on July 2, 2014. As such, this notice is to inform SSA that is may proceed with its redetermination of the cases of the individuals on the previously transmitted list." *Id.*

---

[12] *Social Security Disability Benefits: Did a Group of Judges, Doctors, and Lawyers Abuse Programs for the Country's Most Vulnerable: Hearing Before the Committee on Homeland Security and Governmental Affairs*, 113th Cong. (2013), *available at* https://www.gpo.gov/fdsys/pkg/CHRG-113shrg85499/pdf/CHRG-113shrg85499.pdf.

[13] "How Some Legal, Medical, and Judicial Professionals Abused Social Security Disability Programs for the Country's Most Vulnerable: A Case Study of the Conn Law Firm."

[14] *Supra* n.8 at 127

13

- **May 18, 2015** – SSA's Appeals Council writes to Mr. Ousley to provide him notice that his award is subject to redetermination due to the allegations of fraud. R.13-1, Page ID #95.

As this timeline provides, nearly nine years passed from when SSA employees first made formal complaints regarding the alleged fraud that triggered Mr. Ousley' redetermination hearing. And even if one assumes that the Huntington, WV supervisors did not properly report the complaints, there is evidence that in July 2009 the complaints reached the desk of the Office of Inspector General. From the period of 2009 to 2014, the evidence strengthened, but SSA still failed to institute redetermination proceedings. And even assuming *arguendo* that the "immediately" requirement at 42 U.S.C. §§ 405(u)(1)(A), 1383(e)(7)(A)(i) is not made until SSA says it has reason to suspect fraud in an individual claimant's case, this was met at the latest in July 2, 2014 when OIG provided the SSA general counsel with a list of 1,787 claimants' names.

The SSA explanation is apparently to maintain they had to wait for the O.I.G report. This a disingenuous position at best. The O.I.G. was also under a legal mandate to act in a timely manner. Their failure to so is also a clear violation of 42 U.S.C. 1320a–8:

**(l) As soon as the Inspector General, Social Security Administration, has reason to believe that fraud was involved in the application of an individual for monthly insurance benefits under title II or for benefits under title VIII or XVI, the Inspector General shall make available to the Commissioner of Social Security information identifying the individual, unless a United States attorney, or equivalent State prosecutor, with jurisdiction over potential or actual related criminal cases, certifies, in writing, that there is a substantial risk that making the information so available in a particular investigation or redetermining the eligibility of the individual for such benefits would jeopardize the criminal prosecution**

14

**of any person who is a subject of the investigation from which the information is derived.**

Regardless of whether one views the relevant trigger date as late 2006, July 2009, sometime between 2009 and 2014, or July 2, 2014, at that point in time, SSA and the O.I. G. had an obligation under the Social Security Act to "immediately" initiate redetermination hearings. Even taking the latest date, waiting nearly a year from July 2, 2014 until May 18, 2015 is not acting "immediately."

The only excuse for a failure to act "immediately" under §§ 405(u)(1)(A), 1383(e)(7)(A)(i) is the prosecutorial exception. For this exception to apply, "a United States attorney, or equivalent State prosecutor, with jurisdiction over potential or actual related criminal cases" must "certify], in writing, that there is a substantial risk that such action by the Commissioner of Social Security with regard to beneficiaries in a particular investigation would jeopardize the criminal prosecution of a person involved in a suspected fraud." Neither Mr. Ousley nor his counsel have any knowledge of such a certification. If one exists, it should be the Defendant's burden to produce it. Until one is produced, the exception cannot apply.

The "immediately" requirement sets an important limit that is analogous to a statute of limitations. As the Supreme Court explained in another case involving improper treatment of disability claimants, *Bowen v. New York*, 476 U.S. 467, 481 n.13 (1986), limitations periods promote justice by preventing surprises and the associated problems of unavailable evidence. "The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." *Id.* (quoting *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974)).

15

- The reference in the timeline to the criminal conduct and felony guilty plea of former Chief Judge Charlie Andrus points to a plausible explanation as to the seemingly inexplicable delay in initiating the process, The supplement to the Andrus guilty plea agreement entered on June 14, 2016 in the case of United States v Andrus (U.S. District Lexington, KY) provides not only the basis for now former Judge Andrus felony guilty plea, but also provides an important background information as to why the SSA did not initiate the proceedings in a timely manner. Judge Andrus was no ordinary employee of the SSA. He was the supervisor of "all Huntington Hearing office employees" according to his plea agreement documents.
- At the time he received the information that employee Sarah Carver was attempting to expose the apparent improper relationship between Conn and the Judge Daugherty, he entered into a heavy handed attempt to intimidate and frame Sarah Carver in an attempt to silence her and presumably others. Given his prominent position, as the supervisor of "all Huntington Hearing office employees", combined with his outrageous criminal actions to suppress and intimidate at least one lower level employee, this conduct can be logically linked to the delay in question. One need not be a conspiracy theorist to reach the conclusion that his conduct sent a chill through the agency that effectively froze the process, all to the detriment of the plaintiff and others similarly situated. Such conduct is clearly imputable to the SSA, given the supervisory position that Andrus occupied. In other words, his conduct does not provide an excusable reason for delay, but rather an inexcusable reason for the delay. It is unclear to the plaintiff the degree to which the Andrus misconduct infected the SSA bureaucracy. The plaintiffs believe that an evidentiary hearing or discovery would allow the court to have a better understanding of the magnitude of the

16

shocking behavior within the SSA, and can better explain the delay in initiating the proceedings.

The delay has made a difference to Mr. Ousley because as more time passed since 2010, it became increasingly difficult for him to develop evidence that was material to the time period up to September 2, 2010. This also affects Mr. Ousley's ability to mitigate the damages flowing from the Defendant's delay by filing a new claim for benefits. Just as it gets progressively harder to develop evidence relevant to 2010 as more time passes, the same is true to 2011, 2012, 2013, etc. Further, because eligibility for social security disability benefits requires that an individual have 20 credits in the 10 years before becoming disabled, *see* 20 C.F.R. § 404.130(b)(2), as more time passes, it becomes more difficult for Mr. Ousley to meet the 10-year requirement.

In conclusion, the Defendant's failure to "immediately" start the redetermination process has wronged Mr. Ousley by upsetting his settled expectations and prejudicing his ability to defend himself or secure replacement benefits. The Court may reserve final judgment on the "immediately" argument once there is an opportunity for a hearing on this issue, but Mr. Ousley has a sufficient likelihood of success to warrant preserving his benefits while this case is pending.

For the reason stated, the defendants motion to dismiss should be denied.

        Respectfully submitted,

        /s/ Joseph Lane_____
        JOSEPH LANE
        PILLERSDORF, DEROSSETT & LANE
        124 W Court Street
        Prestonsburg, Kentucky 41653
        (606) 886-6090
        *Attorney for Willie Ousley on behalf of the estate of Patricia L. Ousley*

### **CERTIFICATE OF SERVICE**

  I certify that on July 21, 2016 the foregoing document was submitted via ECF, which will send a notice of electronic filing to John S. Osborn, III, Esq., counsel for the Commissioner.

        /s/ Joseph Lane_____
        JOSEPH LANE