**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**SOUTHERN DIVISION AT PIKEVILLE**

*In re* **MOTIONS TO DISMISS**
**Civil Action Nos.**

16-53-ART, 16-64-ART, 16-89-ART, 16-95-ART, 16-106-ART, 16-115-ART, 16-154-ART

## ACTING COMMISSIONER'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT

Congress created a process that carefully and constitutionally balances the Federal government's ability to ensure the integrity of the Social Security Administration's (SSA) disability benefits programs and an individual's opportunity to show that he or she is entitled to those disability benefits.  In balancing those interests, Congress directed that when the Social Security Administration's Office of the Inspector General (OIG) has reason to believe that fraud is involved in an individual's application for benefits, that "reason to believe" begins a process to determine whether those individuals should continue to receive those benefits.

Plaintiffs assert that the process created by Congress violates constitutional due process because they do not have the ability to challenge OIG's reason to believe that fraud occurred. But the reason to believe that fraud occurred only initiates a process to determine eligibility for benefits and does not determine that an individual will not continue to receive benefits. Plaintiff's assertion otherwise upends the balance created by Congress.

The process created by Congress is working for the large-scale fraud scheme that led to these cases.  The Federal government has been able to pursue criminal and civil prosecution and ensure program integrity.  To date, the agency has found that many individuals, despite being caught up in the large-scale fraud scheme, were entitled to disability benefits under the

requirements of the Social Security Act (the Act).  Those individuals whom the agency finds

were entitled to disability benefits only because of the large-scale fraud scheme may exercise

their rights to administrative or judicial remedies.

## BACKGROUND

In the early 1990s, Congress was dismayed to discover a massive fraud case in California

involving 2,000 Southeast Asian immigrants and the Supplemental Security Income (SSI)

program.  These individuals, who Congress acknowledged to be mostly victims of profit-seeking

"middlemen," had been induced (and in some cases coerced) into fraudulently applying for SSI

benefits.  Hallmarks of the fraud scheme included middlemen coaching claimants to feign

symptoms, falsely certified translations, "numerous applications with the same handwriting and

wording claiming mental disabilities," and medical reports submitted by certain doctors using

identical 'boiler plate' symptoms of disability" evidencing a "numbing sameness."  *See* Report

on Reforms to Address Supplemental Security Income Fraud and Abuse Involving Middlemen,

at 4, 7 (May 12, 1994).

After a year-long investigation, as well as a congressional hearing, on May 12, 1994, the

Subcommittee on Oversight of the House Ways and Means Committee issued a report finding

that "SSA had done very little to prevent fraud in the application process, and had done nothing

to stop the payment of SSI benefits which were fraudulently obtained" *Id*. at IV, 7.  The report

also noted that the agency's reopening rules were not effective to prevent this fraud because they

were "cumbersome and unworkable" *Id.* at 7.  The Report recommended that "[t]he Social

Security Act should be amended to require that HHS OIG makes SSI 'recipient identifying

information' available to SSA as soon as it is known and to require that SSA immediately

2

proceed administratively to reopen SSI cases when there is a reason to believe that an application or supporting documents are fraudulent[.]"  *Id.* at 8.

In 1994, Congress enacted sections 205(u), 1129(l), and 1631(e)(7) of the Act, 42 U.S.C. §§ 405(u), 1320a-8(l), 1383(e)(7)(A)(ii), to create a new "streamlined procedure . . . to expeditiously terminate fraudulently obtained SSI benefits."  Pub. L. No. 103-296, § 206(d), the Social Security Independence and Program Improvements Act of 1994, 108 Stat. 1464, 1514; 140 Cong. Rec. H4750-03, H571, 1994 WL 274789 (the bill passed by Congress follows the House bill on this provision, but expands the scope of the provision to include claims under both title II and title XVI of the Act).

Read together, these statutory provisions require that, as soon as the SSA OIG has reason to believe that fraud was involved in an individual's application for disability benefits, it must make that information available to the agency, and the agency must "immediately redetermine" the individual's entitlement to benefits.  *See* 42 U.S.C. §§ 405(u), 1320a-8(l), 1383(e)(7)(A)(ii). In conducting that redetermination, the agency must "disregard any evidence if there is reason to believe that fraud or similar fault was involved in the providing of such evidence."  *Id.*  If after conducting the redetermination, the agency determines that there is insufficient evidence to support the individual's entitlement to benefits, the agency "may terminate such entitlement and may treat benefits paid on the basis of such insufficient evidence as overpayments."  42 U.S.C § 405(u)(3); *see also* 42 U.S.C. § 1383(e)(7)(C).

A.  Huntington, West Virginia Alleged Fraud Scheme

Plaintiffs' lawsuits arise out of an investigation conducted by the SSA OIG into a complex disability fraud scheme that resulted in the federal indictment of attorney Eric C. Conn, former SSA Administrative Law Judge (ALJ) David Daugherty, and medical source Bradley

Adkins, Ph.D.  *See* Indictment, *United States v. Conn*, No. 5:16-cr-22 (E.D. Ky. Apr. 1, 2016). As outlined in the indictment, ALJ Daugherty assigned Conn's cases to himself; ALJ Daugherty solicited falsified medical evidence from Conn—who provided pre-completed template residual functional capacity reports to doctors for their signatures, including Dr. Adkins, Frederic Huffnagle, M.D., and David Herr, D.O.; and ALJ Daugherty issued favorable on-the-record decisions based exclusively on the medical evidence from these one-time examining doctors, all for monetary kickbacks from Conn.  *Id.*

    A.  Plaintiffs' Original Favorable Decisions

    A closer analysis of Plaintiffs' claim files illustrates how this alleged fraudulent scheme took place in practice.  In all of these cases ALJ Daugherty's decision was authored shortly after receiving evidence from Conn's doctors, without holding a hearing; was devoid of any meaningful discussion or analysis of the evidence; and cited only the examining doctor's opinion in support of his boilerplate conclusion that the claimant was disabled and entitled to benefits (*see* Case No. 7:16-cv-00053, ECF No. 26 (Blackburn Tr.) 80-84; Case No. 7:16-cv-00089, ECF No. 19 (Justice Tr.) 73-76; Case No. 7:16-cv-00095, ECF No. 22 (Jenkins Tr.) 65-69; Case No. 7:16-cv-00115, ECF No. 23 (Hale Tr.) 61-64; Case No. 7:16-cv-00154, ECF No. 20 (Hicks Tr.) 83-85; Case No. 7:16-cv-00064, ECF No. 19 (Ousley Tr.) 106-10; Case No. 7:16-cv-00106, ECF No. 19 (Adams Tr.) 137-42).

**Linda Blackburn, Case No. 7:16-cv-00053**

- Blackburn applied for DIB and SSI in October 2008 (Blackburn Tr. 186-91).

- SSA denied Blackburn's applications initially in February 2009 (Blackburn Tr. 70-71) and on reconsideration in March 2009 (Blackburn Tr. 73-74).

- On **April 1, 2009**, Blackburn requested a hearing before an ALJ (Blackburn Tr. 102-03).

- Dated **April 14, 2009**, Dr. Huffnagle's medical evidence was submitted to SSA. (Exhibit A: Declaration of Kelly Salzmann (Salzmann Decl.) ¶ 3).

- On **May 5, 2009**, ALJ Daugherty issued an on-the-record fully favorable decision (Blackburn Tr. 80-84), stating:

  *Having considered all of the evidence, I am satisfied that the information provided by Dr. Huffnagle most accurately reflects the claimant's impairments and limitations. Therefore, the claimant is limited to less than sedentary work at best.*

  (Blackburn Tr. 82).[1]

## Cherrie Justice, Case No. 7:16-cv-00089[2]

- Justice applied for DIB in September 2008 (Justice Tr. 158-59).

- SSA denied Justice's application initially in February 2009 (Justice Tr. 66) and on reconsideration in March 2009 (Justice Tr. 67).

- On **April 1, 2009**, Justice requested a hearing before an ALJ (Justice Tr. 95-96).

- Dated **April 14, 2009**, Dr. Huffnagle's medical evidence was submitted to SSA. (Salzmann Decl. ¶ 3; *see also* Justice Tr. 830-837).

- On **May 5, 2009**, ALJ Daugherty issued an on-the-record fully favorable decision (Justice Tr. 73-76), stating:

  *Having considered all of the evidence, I am satisfied that the information provided by Dr. Huffnagle most accurately reflects the claimant's impairments and limitations. Therefore, the claimant is limited to sedentary work at best.*

  (Justice Tr. 75).

---

[1] SSA's Office of Disability Adjudication and Review's average case processing time in 2009 was 481 days. *See* Social Security Administration, Historical Data for Average Processing Time Until Hearing Held, available at https://www.ssa.gov/open/data/Average-Proc-Time-Until-Hearing-Held.html (last viewed on Sept. 15, 2016). However, ALJ Daugherty often disposed of these cases in a matter of weeks.

[2] Ms. Blackburn and Ms. Justice both requested a hearing before an ALJ on April 1, 2009, and they both received a fully favorable decision without a hearing from ALJ Daugherty on May 5, 2009.

**Roy Hale, Case No. 7:16-cv-00115**

- Hale applied for DIB in June 2006 (Hale Tr. 128-29).

- SSA denied Hale's applications initially in September 2006 (Hale Tr. 52) and on reconsideration in November 2006 (Hale Tr. 55).

- On **December 13, 2006**, Hale requested a hearing before an ALJ (Hale Tr. 95)

- Dated **January 5, 2007**, Dr. Huffnagle's medical evidence was submitted to SSA. (Salzmann Decl. ¶ 3).

- On **January 16, 2007**, ALJ Daugherty issued an on-the-record fully favorable decision (Hale Tr. 61-64), stating:

  *Having considered all of the evidence, I am satisfied that the information provided by Dr. Huffnagle most accurately reflects the claimant's impairments and limitations.  Therefore, the claimant is limited to less than sedentary work, at best.*

  (Hale Tr. 62).

**Leah Jenkins, Case No. 7:16-cv-00095**

- Jenkins applied for DIB in April 2008 (Jenkins Tr. 177-78).

- SSA denied Jenkins's applications initially in June 2008 (Jenkins Tr. 58) and on reconsideration in July 2008 (Jenkins Tr. 59).

- On **August 8, 2008**, Jenkins requested a hearing before an ALJ (Jenkins Tr. 87).

- Dated **September 11, 2008**, Dr. Adkins's medical evidence was submitted to SSA.  (Salzmann Decl. ¶ 3).

- On **October 2, 2008**, ALJ Daugherty issued an on-the-record fully favorable decision (Jenkins Tr. 65-69), stating:

> *Having considered all of the evidence, I am satisfied that the information*
> *provided by Dr. Adkins most accurately reflects the claimant's impairments and*
> *limitations.  Therefore, the claimant is limited to sedentary work at best"[3]*

(Jenkins Tr. 67).

## Amy Jo Hicks, Case No. 7:16-cv-00154

- Hicks applied for SSI in September 2007 (Hicks Tr. 198-200).

- SSA denied Hicks's applications initially in November 2007 (Hicks Tr. 72) and on reconsideration in April 2008 (Hicks Tr. 73).

- On **May 29, 2008**, Hicks requested a hearing before an ALJ (Hicks Tr. 96-97).

- Dated **Jun 19, 2008**, Dr. Adkins's medical evidence was submitted to SSA. (Salzmann Decl. ¶ 3).

- On **July 2, 2008**, ALJ Daugherty issued an on-the-record fully favorable decision (Hicks Tr. 83-85), stating:

> *Having considered all of the evidence, I am satisfied that the information*
> *provided by Dr. Adkins most accurately reflects the claimant's impairments and*
> *limitations.*

(Hicks Tr. 85).

## Willie Ousley o.b.o. Patricia Ousley, Case No. 7:16-cv-00064

- Ousley applied for DIB in October 2009 (Ousley Tr. 209-10).

- SSA denied Ousley's applications initially in January 2010 (Ousley Tr. 100) and on reconsideration in March 2010 (Ousley Tr. 101).

- On **April 21, 2010**, Ousley requested a hearing before an ALJ (Ousley Tr. 142-43).

- Dated **July 29 and 30, 2010**, Dr. Herr's medical was submitted to SSA. (Salzmann Decl. ¶ 3).

---

[3] Dr. Adkins is a psychologist, and Plaintiff Jenkins's impairments were mental—rather than physical—in nature (Jenkins Tr. 67).

- On **September 2, 2010**, ALJ Daugherty issued an on-the-record fully favorable decision in September 2010 (Ousley Tr. 106-10), stating:

  *Having considered all of the evidence, I am satisfied that the information provided by Dr. Herr most accurately reflects the claimant's impairments and limitations. Therefore, the claimant is limited to sedentary work at best.*

  (Ousley Tr. 108).

**Sheila Adams, Case No. 7:16-cv-00106**

- Adams applied for DIB and SSI in August 2008 (Adams Tr. 229-34).

- Adams's applications were denied initially in December 2008 (Adams Tr. 126-27) and on reconsideration in February 2009 (Adams Tr. 130-31).

- Adams requested a hearing in March 17, 2009 (Adams Tr. 162-63).

- On **October 23, 2009**, SSA acknowledged the request for a hearing (Tr. 178-179).

- Dated **November 3 and 4, 2009**, Dr. Huffnagle's medical evidence was submitted to SSA. (Salzmann Decl. ¶ 3; *see also* Adams Tr. 538-545).

- On **November 30, 2009**, ALJ Daugherty issued an on-the-record fully favorable decision (Adams Tr. 137-41), stating:

  *Having considered all of the evidence, I am satisfied that the information provided by Dr. Huffnagle most accurately reflects the claimant's impairments and limitations. Therefore, the claimant is limited to less than sedentary work at best.*

  (Adams Tr. 139).

B.  The Redetermination Process under Sections 205(u) and 1631(e)(7) of the Act

On May 12, 2015, pursuant to section 1129(l) of the Act, 42 U.S.C. § 1320a-8(l), SSA

OIG informed the agency that there was reason to believe that fraud was involved in the

applications for benefits of approximately 1,800 individuals (Salzmann Decl. ¶ 2, Attachment 1).

Specifically, SSA OIG had reason to believe that Mr. Conn or his firm submitted pre-completed

"template" residual functional capacity forms purportedly from Bradley Adkins, Ph.D., Srinivas

Ammisetty, M.D., Frederic Huffnagle, M.D., or David P. Herr, D.O., dated between January 2007 and May 2011, in support of these individuals' applications for benefits (*id.*).

Approximately one week after receipt of the OIG referral, in May 2015, the Appeals Council (AC) contacted only the individuals in which—after disregarding the suspect evidence identified by OIG—there was insufficient remaining evidence to support their original favorable determinations, and informed them that the AC planned to remand their cases to a new ALJ for further proceedings and a new decision[4] (*id.* ¶ 4).  Plaintiffs were among those individuals contacted by the AC (*see* Blackburn Tr. 118-125, Hale Tr. 96-99, Justice Tr. 111-118, Jenkins Tr. 102-107, Hicks Tr. 105-110, Ousley Tr. 164-169, Adams Tr. 185-190).  The individuals had ten days to provide evidence that would allow the AC to make a decision without having to remand the case to an ALJ.  If the beneficiary requested, the AC provided a 30-day extension of time, with additional extensions available upon a showing of good cause.

Plaintiffs' cases were ultimately remanded, and each appeared at a hearing before a new ALJ (*see* Blackburn Tr. 30-63, Hale Tr. 28-51, Justice Tr. 25-57, Jenkins Tr. 38-57, Hicks Tr. 28-58, Ousley Tr. 26-76, Adams Tr. 34-125).  After considering the hearing testimony and relevant evidence already in the file, along with any new relevant evidence submitted by the Plaintiffs, the ALJs in Plaintiffs' cases concluded that there was insufficient evidence in the administrative record to support Plaintiffs' original entitlement to benefits (*see* Blackburn Tr. 10-29, Hale Tr. 6-27, Justice Tr. 8-24, Jenkins Tr. 6-25, Hicks Tr. 7-27, Ousley Tr. 6-25, Adams Tr. 12-32).

---

[4] The AC found that there was sufficient evidence to support ALJ Daugherty's original favorable decision in approximately 14% of the cases, and a notice was not sent to these individuals (Salzmann Decl. ¶ 4).

To date, hearings have been held in approximately 94% of the cases remanded by the AC, with ALJ decisions issued in approximately 88% of cases (Salzmann Decl.¶ 5).  Of those ALJ decisions, approximately 47% found that the evidence of record supported ALJ Daugherty's original favorable decision (*id.*).

## THE COURT'S QUESTIONS

In its September 9, 2016 Minute Order, the Court posed a series of question regarding SSA's fraud redetermination process under sections 205(u), 1129(l), and 1631(e)(7) of the Act. The Commissioner answers each question in turn, and then more fully discusses why the redetermination process prescribed by these provisions does not violate procedural due process.

(1)    How does the 205(u) redetermination process work?

Under section 1129(l) of the Act, 42 U.S.C. § 1320a -8(l), which was enacted along with sections 205(u) and 1631(e)(7), Congress directed the SSA OIG to notify the agency once it had "reason to believe" that fraud was involved in the application of an individual for disability benefits.  In such instances, sections 205(u) and 1631(e)(7) of the Act require SSA to "immediately redetermine" an individual's entitlement to benefits and to "disregard any evidence" in which there is reason to believe that fraud or similar fault was involved in providing that evidence.  42 U.S.C. §§ 405(u)(1), 1383(e)(7)(A).  If, after redetermination, the Agency finds that "there is insufficient evidence to support" continued entitlement, the Agency "may terminate such entitlement and may treat benefits paid on the basis of such insufficient evidence as overpayments."  42 U.S.C. § 405(u)(3); *see also* 42 U.S.C. § 1383(e)(7)(C).

> **a. Where in the text of the statute does Congress create the "evidentiary rule" that when OIG's reason to believe that fraud is involved in an individual's application, the parties cannot challenge the finding?**

While the statute does not specifically state that an individual is precluded from challenging OIG's reason to believe that fraud is involved in his or her application, Congress foreclosed the possibility of such challenge by authorizing OIG to notify only the Commissioner of its reason to believe—not the individual.  By contrast, when the Commissioner issues an unfavorable disability decision, 42 U.S.C. § 405(b)(1), Congress required SSA to notify the individual of the Commissioner's finding.  By not directing OIG to notify both the Commissioner and the individual of its finding, Congress did not provide the individual with a right to challenge OIG's reason to believe at this stage.  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks omitted)).

Likewise, once notified by OIG of a reason to believe that fraud was involved in an individual's application, the Commissioner is bound to follow the process prescribed by Congress without deviation to entertain a challenge to that process:  "The Commissioner of Social Security *shall* immediately redetermine the entitlement . . . if there is reason to believe that fraud or similar fault was involved in the application . . . ."  42 U.S.C. § 405(u)(1)(A) (emphasis added); *see also* 42 U.S.C. § 1383(e)(7)(A)(i).  Further, Congress directed that "the Commissioner of Social Security *shall* disregard any evidence if there is a reason to believe that fraud or similar fault was involved in providing that evidence."  42 U.S.C. §§ 405(u)(1)(B), 1383(e)(7)(A) (emphasis added).  By using the mandatory term "shall," Congress precluded

11

individuals from halting the redetermination process and revoked the Commissioner's discretion to consider evidence believed to be fraudulent under the agency's own rules and regulations, and thus restricted the administrative record on which the Commissioner could base her decision. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("[T]he mandatory 'shall' . . . normally creates an obligation impervious to . . . discretion." (internal citations omitted)).

> **b. Does Congress have the power to dictate what evidence an ALJ may not consider?**

Yes, Congress does have the power to dictate what evidence an ALJ may and may not consider. Agencies are creatures of Congress: "an agency literally has no power to act unless and until Congress confers power upon it." *City of Arlington, Tex. v. FCC*, 133 S.Ct. 1863, 1880 (2013) (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986)). The legal status, powers, and purpose of administrative agencies are prescribed by acts of Congress. U.S. Constitution, Art 1, section 1. In reviewing the agency's construction of the statute that it administers, if the intent of Congress is clear, the court and the agency must give effect to the unambiguously expressed intent of Congress. *Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842-843 (1984).

SSA is no exception. While an SSA ALJ has qualified decisional independence, the Commissioner is ultimately authorized to make final decisions in benefit cases and ALJs are subordinate to the Commissioner in matters of policy and interpretation of law. *See Nash v. Bowen*, 869 F.2d 675, 680 (2nd Cir.) *cert. denied*, 493 U.S. 812 (1989); *see also Iran Air v. Kugelman*, 996 F.2d 1253, 1260 (D.C. Cir. 1993) ("It is commonly recognized that ALJs are entirely subject to the agency on matters of law."). The basic concept of the independent ALJ requires that he conduct the cases over which he presides with complete objectivity and

independence.  In so operating, however, he is governed by the applicable and controlling

precedents including the applicable statutes and agency regulations, the agency's policies as laid

down in its published decisions, and applicable court decisions.

And Congress's intent about the action the Commissioner must take was exceedingly

clear:  "When redetermining the entitlement, or making an initial determination of entitlement, of

an individual under this subchapter, the Commissioner of Social Security shall disregard any

evidence if there is reason to believe that fraud or similar fault was involved in the providing of

such evidence."  42 U.S.C. § 405(u)(1)(B); *see also* 42 U.S.C. § 1383(e)(7)(A)(ii).

This is not the only time Congress has enacted restrictions on the administrative record.

*See* 42 U.S.C. §§ 423(d)(5)(C), 1320b-6(j)(1)(B).  Most recently, section 812 of the Bipartisan

Budget Act (Public Law No: 114-74) amended section 223(d)(5) of the Act, 42 U.S.C. 423(d)(5),

by adding a new paragraph "C."  Under this provision, when SSA makes a disability

determination or decision or when SSA conducts a continuing disability review (CDR) under

titles II or XVI of the Act, SSA cannot consider evidence furnished by certain sources, unless the

agency has good cause.  In particular, SSA and, by extension, its ALJs, may not consider

evidence furnished by a source who was (1) convicted of a felony under sections 208 and 1632

of the Act; (2) excluded from participating in any Federal healthcare program under section 1128

of the Act; or (3) imposed with a civil monetary penalty (CMP) or an assessment (or both) has

been imposed upon a medical source for the submission of false evidence under section 1129 of

the Act.

### c.  Does the Due Process Clause require the parties get a chance to challenge the agency evidentiary decisions?

Generally yes, but not in all cases–and not here.  Courts have routinely found that due

process does not require an automatic right to challenge every SSA evidentiary decision.

13

*See Flatford v. Chater*, 93 F.3d 1296, 1305 (6th Cir. 1996) (due process does not require the Commissioner to allow a claimant to cross-examine every physician providing post-hearing evidence); *Yancey v. Apfel*, 145 F.3d 106, 113 (6th Cir. 1998) (same); *Mancari v. Colvin*, No. 15 C 1105, 2016 WL 3951415, at *4 (N.D. Ill. July 21, 2016) (due process did not require the Commissioner to conduct an independent review of the Immigration and Naturalization Service's factual findings leading to beneficiary's deportation before terminating benefits); *see also Kaley v. U.S.*, 134 S. Ct. 1090, 1103 (2014) (due process did not require additional or substitute procedural safeguards where an individual was unable to contest a grand jury's determination of probable cause that a crime was committed, thereby allowing the government to freeze assets prior to trial if they would be subject to forfeiture upon conviction).

As a general matter, due process requires "the opportunity to be heard . . . at a meaningful time and in a meaningful manner" before the termination of public assistance payments. *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (quotations and citations omitted).  But at the same time, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands."  *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

Thus, and for example, SSA may initiate a CDR based on "[e]vidence we receive [that] raises a question whether your disability or blindness continues," but the beneficiary cannot challenge whether the agency had sufficient evidence to initiate the CDR.  20 C.F.R. §§ 404.903(z), 404.1590(b)(9); 416.1403(a)(24), 416.990(b)(9).  Additionally, a claimant cannot challenge the agency's refusal to recognize his representative, based on the agency's findings

that his representative violated our rules.  *See* 20 C.F.R. §§ 404.903(g), 404.1705, 404.1745, 416.1403(7), 416.1505, 416.1545).[5]

And, as discussed more fully below, the Due Process Clause does not bestow on an individual with the right to challenge OIG's "reason to believe" fraud was involved in his or her application benefits.

### d.   What parts of the redetermination process are judicially reviewable?

When the agency determines that there is insufficient evidence to support the individual's original entitlement to benefits, it notifies the individuals whose entitlement is at issue, and informs them of their rights to submit additional evidence (*see* Blackburn Tr. 118-125; Hale Tr. 96-99; Justice Tr. 111-118; Jenkins Tr. 102-107; Hicks Tr. 105-110; Ousley Tr. 164-169; Adams Tr. 185-190).  After a hearing, if an individual is dissatisfied with the ALJ's decision, the individual has a further opportunity to request review of the decision by the AC. *See* 20 C.F.R. §§ 404.967-68, 416.1467-68.  If the AC denies the request for review  then the ALJ decision becomes the Agency's final decision for purposes of judicial review under section 205(g) of the Act.  20 C.F.R. §§ 404.981, 416.1481; *see also* 42 U.S.C. § 405(g).  Similarly, if the AC grants a request for review and issues its own decision then this decision becomes the Agency's final decision for purposes of judicial review under section 205(g).  42 U.S.C. § 405(g)-(h); *see also id.* § 1383(c)(3), 20 C.F.R. §§ 404.981, 416.1481.

In sum, SSA's final decision that there was insufficient evidence in Plaintiffs' cases to support their original favorable decisions made after a hearing is judicially reviewable under section 205(g).  42 U.S.C. § 405(g).

---

[5] The list of non-reviewable determinations in the regulations is not exclusive.  20 C.F.R. §§ 404.903, 416.1403.

(2)   <u>How did the redetermination process work in the Plaintiffs' cases specifically?</u>

On May 12, 2015, pursuant to section 1129(l) of the Act, 42 U.S.C. § 1320a-8(l), SSA

OIG informed the agency that there was reason to believe that fraud was involved in the

applications for benefits of approximately 1,800 individuals (Salzmann Decl. ¶ 2, Attachment 1).

Specifically, SSA OIG had reason to believe that Conn or his firm submitted pre-completed

"template" residual functional capacity  forms purportedly from Bradley Adkins, Ph.D., Srinivas

Ammisetty, M.D., Frederic Huffnagle, M.D., or David P. Herr, D.O., dated between January

2007 and May 2011, in support of the individuals' applications for benefits (*id.*).

Following receipt of this information, SSA was required by statute to redetermine those

individuals' entitlement to benefits in accordance with sections 205(u) and 1631(e)(7) of the Act.

42 U.S.C. §§ 405(u) and 1383(e)(7).  Approximately one week after receipt of the OIG referral

in May 2015, the AC notified only the individuals where there was insufficient remaining

evidence to support their original favorable determinations that the AC planned to remand their

cases to an ALJ for further proceedings and a new decision (Salzmann Decl. ¶ 3).  Plaintiffs were

among those individuals (*see* Blackburn Tr. 118-125; Hale Tr. 96-99; Justice Tr. 111-118;

Jenkins Tr. 102-107; Hicks Tr. 105-110; Ousley Tr. 164-169; Adams Tr. 185-190).  The

ndividuals had ten days to provide evidence that would allow the AC to make a decision without

having to remand the case to an ALJ. If the beneficiary requested, the AC provided a 30-day

extension of time, with additional extensions available upon a showing of good cause.

Plaintiffs' cases were ultimately remanded by the AC, <u>and each appeared at a hearing</u>

<u>before an ALJ</u>, where they were able to testify and submit evidence up to the date of the hearing

(*see* Blackburn Tr. 30-63; Hale Tr. 28-51; Justice Tr. 25-57; Jenkins Tr. 38-57; Hicks Tr. 28-58;

Ousley Tr. 26-76; Adams Tr. 34-125).  After considering the hearing testimony and all of the

evidence in the administrative record, the ALJs in Plaintiffs' cases concluded that there was insufficient evidence in the administrative record to support Plaintiffs' original entitlement to benefits (*see* Blackburn Tr. 10-29; Hale Tr. 6-27; Justice Tr. 8-24; Jenkins Tr. 6-25; Hicks Tr. 7-27; Ousley Tr. 6-25; Adams Tr. 12-32).

At any time during the redetermination process, Plaintiffs were entitled to file a new application for benefits. *See* Social Security Ruling (SSR) 16-1p, 81 Fed. Reg. 13436 (Mar. 14, 2016). When Plaintiffs' benefits are terminated, and SSA assesses an overpayment, Plaintiffs may also seek a waiver of that overpayment. *See* 42 U.S.C. § 404(b) ("In any case in which more than the correct amount of payment has been made, there shall be no adjustment of payments to, or recovery by the United States from, any person who is without fault if such adjustment or recovery would defeat the purpose of this title or would be against equity and good conscience."); *see also* 42 U.S.C. § 1383(b)(1)(B); 20 C.F.R. §§ 404.501-404.502a, 404.506-404.512, 416.537-416.538, 416.550-416.590.

### a.   Did SSA follow § 405(u)?

Yes, SSA acted consistently with its statutory mandate under sections 205(u) and 1631(e)(7) of the Act. 42 U.S.C. §§ 405(u), 1383(e)(7). Although SSA believes the statutory mandate is clear, even if Plaintiffs believe it is ambiguous, SSA's interpretation and application of the Act are reasonable and entitled to *Chevron* deference. *See* SSR 16-1p, 81 Fed. Reg. 13436 (Mar. 14, 2016); HALLEX I-1-3-25, 2014 WL 2889588, (updated Feb. 25, 2016); *Chevron*, 467 U.S. at 842-43; *see Barnhart v. Walton*, 535 U.S. 212, 221-22 (2002) ("[T]he fact that the Agency previously reached its interpretation through means less formal than 'notice and comment' rulemaking, . . . does not automatically deprive that interpretation of the judicial deference otherwise its due."); *Garcia v. Sec'y of Health & Human Servs.*, 46 F.3d 552, 557

17

(6th Cir. 1995) ("Although social security rulings do not have the force or effect of law, we are persuaded that *Chevron* applies to social security rulings insofar as the rulings directly involve construction of the statute."); *Nat'l Cable &Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) (*Chevron* requires a court to accept reasonable construction of statute even if the agency's reading differs from what the court believes is the best statutory interpretation).

   **b.  When OIG alerted the SSA regarding the fraud, did the SSA take as given that fraud had occurred in every case Eric Conn touched, or did it decide for itself whether fraud occurred in each case?**

   SSA did not redetermine every individual who was represented by Conn.  Between 2007 and 2011, Conn represented over 5,000 individuals in cases before SSA's Office of Disability Adjudication and Review (Salzmann Decl. at ¶ 8).  SSA OIG referred 1,787 individuals, where SSA OIG had identified, after reviewing thousands of claims files, those cases that contained the allegedly pre-completed template residual functional capacity assessment forms.  The Commissioner did not make an independent finding of fraud based on SSA OIG's section 1129(l) referral.  The Commissioner redetermined the entitlement of the individuals identified by SSA OIG to disability benefits under the Act as it was required to do under sections 205(u) and 1631(e)(7) of the Act.  42 U.S.C. §§ 405(u), 1383(e)(7).

(3)   Assuming that SSA followed § 405(u), and assuming that under that section the OIG's fraud findings are unchallengeable, does the redetermination process violate *Goldberg v. Kelly*, 397 U.S. 254 (1970)?  Did Plaintiffs get a chance to challenge the OIG finding? If they did not, why don't they deserve one?

   The redetermination process, which prohibits the Commissioner from considering evidence when there is a reason to believe fraud was involved in providing that evidence, does not violate the Supreme Court's holding in *Goldberg v. Kelly*, 397 U.S. 254 (1970).  In *Goldberg*, the Court required the Government to provide a "pre-termination evidentiary hearing" with "minimum procedural safeguards, adapted to the particular characteristics of welfare

18

recipients, and to the limited nature of the controversies to be resolved" before discontinuing need-based assistance.  397 U.S. at 264, 267.

Here, three Plaintiffs received SSI, which are need-based benefits (*see* Blackburn Tr. 186-91; Hicks Tr. 198-200; Adams Tr. 229-34), and four Plaintiffs received only disability insurance benefits (DIB), which are not need-based (*see* Justice Tr. 158-59; Hale Tr. 128-29; Jenkins Tr. 177-78; Ousley Tr. 209-10).  Therefore, the Supreme Court's *Goldberg* holding only applies to Plaintiffs Blackburn, Hicks, and Adams.  *See Mathews v. Eldridge*, 424 U.S. 319, 424 (1976) (distinguishing DIB beneficiaries from welfare recipients, holding that claimants of "modest means and outside resources" need not be protected by the stringent standards of a pre-termination hearing).

That said, all Plaintiffs received a hearing with "minimum procedural safeguards, adapted to the . . . limited nature of the controversies to be resolved."  *Goldberg*, 397 U.S. at 264, 267. Here, the "controversies to be resolved" are not if the alleged co-conspirators actually committed fraud against the agency.  Those issues are appropriately being addressed in other forums. Rather, the issue to be resolved is whether Plaintiffs are entitled to disability benefits under the Act without regard to the allegations of fraud.  On this issue, Plaintiffs received a pre-termination evidentiary hearing, as well as other procedural protections.  Moreover, nothing in *Goldberg* suggests that certain forms of evidence—including possibly fraudulent evidence—cannot be excluded prior to a hearing with "minimum procedure safeguards . . . ."  *Id.*  Thus, although the redetermination process does not violate *Goldberg v. Kelly,* the inquiry does not end there.

In *Mathews v. Eldridge*, 424 U.S. 319 (1976), the Supreme Court expanded on *Goldberg* and explained how due process challenges should be analyzed, not just for welfare recipients, but all government beneficiaries.  *Id.* at 424.  The *Mathews* balancing test, as recently applied in the

Social Security context by the Sixth Circuit in *Ferriell v. Commissioner of Social Security*, directs courts to weigh the following three factors in evaluating procedural due process claims: (1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of such interest through the procedure used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.  614 F.3d 611, 620-22 (6th Cir. 2010) (holding that "SSA's procedures for reopening disability decisions as applied in [appellant's] case do not violate the guarantees of due process" (citing *Mathews*, 424 U.S. at 335)).

Under the first factor, the private interest involved is Plaintiffs' interest in having a meaningful opportunity to show they were entitled to benefits at the time they were originally allowed.  *See Flatford*, 93 F.3d at 1306; *Yancey*, 145 F.3d at 113.

Under the second factor, there is of course some risk of excluding potentially probative evidence from a redetermination hearing.  But that minimal risk is not enough to overcome the unassailable principle that individuals should not receive benefits based exclusively on suspect evidence, or outweigh the additional procedural safeguards in place for individuals whose entitlement must be redetermined.  Those procedural safeguards include (1) a hearing before a neutral decisionmaker; (2) the right to testify and submit any evidence that is new, material, and related to the period at issue; (3) the right to seek assistance with developing records that are new, material, and related to the period at issue; (4) the right to request review from the AC of a post-hearing unfavorable decision; and (5) ultimately the right to appeal any unfavorable final decision to Federal District court.  Plaintiffs were afforded all of these procedural safeguards. The Commissioner also notes that, while it is not the case for Plaintiffs here, nearly half of the

individuals whose cases were remanded for a new hearing have been able to prove their entitlement (Salzmann Decl. ¶ 5).

Finally, as to the third *Mathews* factor, the government's interest in adhering to the present system is considerable.  As the Sixth Circuit has emphasized,  "[m]easuring the important interests at stake, as described both in *Goldberg v. Kelly* and in *Mathews v. Eldridge*," an individual's "interest in finality of the decision as to whether he is eligible for benefits" does not outweigh the Government's "interest in assuring a fiscally responsible system which is subject to proper auditing."  *Himmler v. Califano*, 611 F.2d 137, 146-47 (6th Cir. 1979); *see also Ching v. Mayorkas*, 725 F.3d 1149, 1158 (9th Cir. 2013) (relevant to the third factor in the *Mathews* test is the degree of defendant's interest in preventing fraud and in avoiding erroneously providing benefits).

If all 1,800 individuals whose entitlement had to be redetermined were granted mini-trials on whether there was a reason to believe that fraud was involved in their individual cases, the costs would be high, overpayments would mount, the criminal proceedings could be jeopardized, the chance of disparate results would be significant, and the agency's strong interest in complying with its statutory mandate to conduct redeterminations "immediately" would be undermined.  *See Erickson v. U.S. ex rel. Dep't of Health & Human Servs.*, 67 F.3d 858, 863 (9th Cir. 1995) ("Requiring full-blown predeprivation hearings would frustrate Congress' intent and impede the Secretary's ability to act quickly. It would also impose significant administrative costs." (citations omitted)).

Moreover, it would be fundamentally unfair—and defeat the primary purpose of procedural due process, *see Quill Corp. v. North Dakota*, 504 U.S. 298, 312 (1992); *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. (1981)—if similarly situated claimants received disparate

decisions based on different factfinders' analysis of the evidence against Conn, ALJ Daugherty, and the medical sources. By bestowing SSA OIG with exclusive authority to conduct investigations into large-scale fraud schemes perpetrated by third parties, requiring OIG to notify the agency of any "reason to believe" findings resulting from its investigations, and requiring the agency to initiate redeterminations based on those findings, the redetermination process as prescribed by Congress ensures that its programs are administered fairly and uniformly.

(4)   <u>If the redetermination process violated the plaintiff's due process rights, what is the proper remedy?</u>

As the Commissioner understands it, this Court's foremost concern is that Congress may have violated Plaintiffs' due process rights in not allowing them to challenge OIG's reason to believe that fraud was involved in the provision of evidence in their cases. The agency believes that the process created by Congress balanced the competing interests, and the agency adamantly contends that the redetermination process enacted by Congress—including the mandatory exclusion of evidence—fully preserves Plaintiffs' due process rights. Nonetheless, to the extent this Court ultimately concludes otherwise, a remand to allow Plaintiffs to challenge OIG's reason to believe would not be a workable solution. As explained directly above, allowing Plaintiffs to challenge the OIG's findings would be problematic on a number of levels, would surely violate the third prong of the *Mathews* balancing test, and would likely undermine rather than protect the due process rights of the Plaintiffs collectively by creating the possibility of disparate results among them.

Nor would a compromise measure of remand to require additional or substitute procedural safeguards be proper. Given the numerous procedural safeguards already in place— to which Plaintiffs have already availed themselves (e.g., multiple opportunities to submit additional evidence, a full administrative hearing before another ALJ, and the right to request

that the Appeals Council review the decision)—the probable value of any additional safeguards would be minimal at best.  As explained above in answering Question (3), the procedural safeguards already in place (along with the reasonable assumption that any evidence excluded from the redetermination process was likely fraudulently generated) greatly reduce, if not fully eliminate, "the risk of erroneous deprivation" of an individual's entitlement to benefits. *See Mathews*, 414 U.S. at 335.

## ARGUMENT

There is no question in this case that due process principles apply to the redetermination process under sections 205(u) and 1631(e)(7), but the central question before this Court is what level of process is due to Plaintiffs.  The requirements of due process are "fluid and fact dependent," *Shoemaker v. City of Howell*, 795 F.3d 553, 559 (6th Cir. 2015), and do not "always prevent deprivations of life, liberty, and property," *Flatford*, 93 F.3d at 1303.  Instead, they ensure that "no deprivation will occur without notice and fair hearing." *Id.  Mathews* requires that—in addressing what level of process is due—the Court consider three distinct factors: (1) the private interest that will be affected; (2) the risk of an erroneous deprivation of that interest through the procedures used, and the probably value of additional or alternative procedural safeguards; and (3) the government's interest in adhering to the present system, including the fiscal and administrative burdens the additional requirements would entail. *Mathews*, 424 U.S. at 335.  Together, those factors establish that the sections 205(u) and 1631(e)(7) redetermination process is constitutional.

23

1. **The Governmental Interest in Expeditiously Redetermining the Entitlement to Benefits in Cases Where There Is a Reason to Believe Fraud Exists Is Substantial.**

In enacting sections 205(u) and 1631(e)(7) of the Act, Congress created a process to address cases of widespread fraud in SSA's programs, and to allow two specific objectives to be pursued simultaneously: (1) the Government's pursuit of criminal investigation and prosecution and (2) the expeditious redetermination of entitlement for those individuals affected by the alleged fraudulent scheme. In crafting a process to meet these objectives, Congress recognized that "suspected fraud" is not "actual fraud," and that beneficiaries should be fairly and uniformly treated. Therefore, sections 205(u) and 1631(e)(7), benefits cannot be terminated based on a "reason to believe" that fraud was involved in an individual's case. Rather, the "reason to believe" simply triggers a process, whereby benefit entitlement can be re-reviewed.

The legislative history behind sections 205(u) and 1631(e)(7) describes the substantial government interest that drove their enactment. In introducing H.R. 4277, Representative Santorum summarized the fraud scheme that prompted the bill as well as the purpose of the new legislation:

> [w]hat we found in this case was, even though this fraud was perpetrated, and 14 people were indicted by California in this fraud case, there were 2,000 people . . . who started to receive benefits in 1993 . . . and yet, the Social Security Administration failed to do one redetermination . . . of any one of these 2,000 people who were involved in this fraud case.
>
> We subsequently, through the work of the subcommittee, convinced Social Security that redeterminations should be done when people who are put on SSI are suspected to [sic] being on there fraudulently. You would think that that would be an obvious case, but it, in fact, took the work of the subcommittee to get them to do it.
>
> Now we are going to put in statute that anytime you have *a suspicious [sic] of fraud* of someone who gets on the SSI rolls that

24

> we will have an immediate redetermination by the Social Security
> Administration.

140 Cong. Rec. H4750-03, H571, 1994 WL 274789 (emphasis added). By enacting sections 205(u) and 1631(e)(7), Congress was attempting to serve the substantial government interest of resolving cases where fraud was suspected and protecting the public fisc from continuing payments to beneficiaries who were not, in fact, disabled. As the Sixth Circuit has emphasized, "[m]easuring the important interests at stake, as described both in *Goldberg v. Kelly* and in *Mathews v. Eldridge*," an individual's "interest in finality of the decision as to whether he is eligible for benefits" does not outweigh the Government's "interest in assuring a fiscally responsible system which is subject to proper auditing." *Himmler v. Califano*, 611 F.2d 137, 146-47 (6th Cir. 1979); *see also Erickson*, 67 F.3d at 863 (holding, in the Medicare reimbursement context, that the government has a "compelling interest in preventing, among other things the waste of public resources" and that requiring "full-blown predeprivation hearings would frustrate Congress' intent and impede the Secretary's ability to act quickly"); *see also Veterans for Common Sense v. Shinseki*, 678 F.3d 1013, 1036 (9th Cir. 2012) ("Congress must be afforded 'considerable leeway to formulate' additional processes and procedures to cure deficiencies in the VA's administration of benefits 'without being forced to conform to a rigid constitutional code of procedural necessities.'" (citing *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 326 (1985)).

Substantially altering the redetermination process in the way Plaintiffs want would impair other significant government interests. If SSA was required to conduct hundreds of mini-trials on the issue of fraud, the administrative costs would soar, overpayments would mount, the criminal proceedings could be jeopardized, and the agency's strong interest in complying with its statutory mandate to conduct redeterminations "immediately" would be undermined. Most

critically, it would be fundamentally unfair—and defeat the primary purpose of procedural due process, *see Quill Corp. v. N.D.*, 504 U.S. 298, 312 (1992); *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. (1981)—if similarly situated claimants received disparate decisions based on different factfinders' analysis of the evidence against Conn, ALJ Daugherty, and the medical sources.

In addition, requiring SSA to factually determine "fraud" in each case would thwart SSA OIG's exercise of the authority granted to it by Congress to identify and prosecute program fraud.  *See, e.g.*, *Standard Oil Co. of Ca. v. F.T.C.*, 596 F.2d 1381, 1385 (9th Cir. 1979), *rev'd on other grounds*, 449 U.S. 232, 101 S. Ct. 488, 66 L. Ed. 2d 416 (1980).[6]

In 1978, Congress enacted the Inspector General Act "to create independent and objective units" to "conduct and supervise audits and investigations related to the programs and operations" of certain federal agencies. 5 U.S.C. app. 3 § 2(1).  The legislative history provides that the "purpose of this legislation is . . . to consolidate existing auditing and investigative resources to more effectively combat fraud, abuse, waste and mismanagement in the programs and operations."  S. Rep. No. 95–1071, at 1; *see* 5 U.S.C. app. 3 §§ 2(1), (2)(B).

Congress was particularly concerned about maintaining the Inspector General's independence and objectivity.  *See* S. Rep. No. 95–1071, at 6 ("In general, the lack of independence of many audit and investigative operations in the executive branch is striking."). To this end, Section 3 required the Inspectors General to be appointed by the President and confirmed by the Senate.  *See* 5 U.S.C. app. 3 § 3. In addition, the Inspector General provides information about its agency to Congress.  *See id.* Although the Inspector General Act places the

---

[6] In *Standard Oil*, the Supreme Court held that the threshold "reason to believe" standard was not a final agency decision for purposes of review, but declined to find if that threshold standard could be reviewed once there was a final agency decision, or if that threshold finding was subject to agency discretion. 449 U.S. at 238 n.7.

Inspector General under the supervision of the head of the agency, the Act prohibits the agency head from interfering with an investigation.  *See id.*  "And the ability to proceed without consent from agency higher-ups is vital to effectuating Congress' intent and maintaining an opportunity for objective inquiries into bureaucratic waste, fraud, abuse, and mismanagement."  *Nat'l Aeronautics & Space Admin. v. Fed. Labor Relations Auth.*, 527 U.S. 229, 240 (1999).

Despite Congress's clear intent to preclude SSA's interference with active OIG investigations, Plaintiffs have suggested that they are entitled to review OIG's investigative file as part of the redetermination process.  However, OIG's investigative file in this case does not pertain only to Plaintiffs, but to thousands of individuals who were represented by Conn and whose claims files evidenced various aspects of the alleged fraudulent conduct—not just the pre-completed residual functional capacity assessment templates.  Disclosing that evidence to Plaintiffs during the pendency of the criminal trial would severely prejudice the Government's ability to prosecute the criminal defendants, not to mention violate the privacy interests of thousands.

In the alternative, some Plaintiffs may suggest that they are entitled to subpoena the suspect medical source to testify that medical evidence was properly certified in Plaintiffs' cases, if improperly certified in countless others.  As an initial matter, co-conspirators should be expected to assert their right against self-incrimination if subpoenaed, and not testify.  But assuming such testimony is possible, Plaintiffs cannot show that their interests in proving that they are "the needle in the haystack," in an otherwise pervasive fraud scheme, outweigh the government's interests in uniform and efficient adjudication of individuals subject to a redetermination, when the agency has provided ample alternative procedural safeguards.

    **2.**      **The Risk of an Erroneous Deprivation of Interest Is Small, and Additional Procedural Safeguards Would Not Significantly Benefit Claimants.**

The second *Mathews* factor—the risk of an erroneous deprivation of interest and the probable value of additional or alternative procedural safeguards—also weighs in favor of the current redetermination process.  This inquiry is guided by "the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions."  *Mathews*, 424 U.S. at 344.  Thus, "the fundamental fairness of a particular procedure does not turn on the result obtained in any individual case," *Walters*, 473 U.S. at 321, but instead looks more generally to the fairness and risk of error in the process provided.

Here, the agency provided Plaintiffs with numerous procedural safeguards to ensure a correct result on the "issue in controversy," namely their entitlement to benefits. *Goldberg*, 397 U.S. at 264, 267.  While Congress compelled the agency to act based on "suspected fraud," it may only terminate an individual's benefits if, *after* disregarding the suspect evidence, SSA determines that there is insufficient evidence supporting the individual's entitlement.  42 U.S.C. §§ 405(u)(3), 1383(e)(7)(C).  Although not required by the statute, the agency offered beneficiaries the opportunity for a hearing before a neutral decisionmaker and to submit additional evidence supporting their entitlement to benefits (Salzmann Decl. ¶ 6).  *See* SSR 16-1p, 81 Fed. Reg. 13436 (Mar. 14, 2016) ("During the redetermination, we will consider evidence that was provided absent fraud or similar fault, and that relates to the individual's entitlement and eligibility from the time of the individual's original allowance, even if that evidence was not presented previously.").  As part of this process, the new ALJ consider the evidence that was before the original ALJ as well as evidence that post-dates the original favorable decision so long as it relates back to the relevant period.  *See* SSR 16-1p, 81 Fed. Reg. 13436 ("We will consider evidence that postdates the original date of the allowance if that

evidence relates to the period at issue.").  The agency could even assist in obtaining evidence if Plaintiff requests.  *See* HALLEX I-1-3-25, 2014 WL 2889588, (updated Feb. 25, 2016) (SSA will develop evidence when "[a] beneficiary requests assistance in developing records that he or she indicates are new, material, and related to the period at issue, and the record does not show that SSA previously made every reasonable effort to develop the same evidence").

Further, even before benefits are terminated, the beneficiaries are entitled to file a new application.  *See* SSR 16-1p, 81 Fed. Reg. 13436 (Mar. 14, 2016).  If benefits are terminated, and SSA assesses an overpayment, the beneficiaries may also seek a waiver of that overpayment. *See* 42 U.S.C. § 404(b) ("In any case in which more than the correct amount of payment has been made, there shall be no adjustment of payments to, or recovery by the United States from, any person who is without fault if such adjustment or recovery would defeat the purpose of this title or would be against equity and good conscience."); *see also* 42 U.S.C. § 1383(b)(1)(B); 20 C.F.R. §§ 404.501-404.502a, 404.506-404.512, 416.537-416.538, 416.550-416.590.  These ample procedural protections mitigated against the risk of erroneous deprivation of benefits.

Plaintiffs urge this Court to presume (without finding) that without the evidence from Drs. Huffnagle, Adkins, Herr or Ammisetty—who did not actually treat Plaintiffs—they will be deprived of benefits to which they are entitled.  And therefore, the argument goes, failing to allow them to challenge the basis for the exclusion, which they contend must be based on SSA's "finding of fact," deprives them of a "meaningful opportunity to be heard" on an issue dispositive in their case.

Plaintiffs' arguments rely on two faulty premises.  First, nowhere in the relevant statutory provisions does Congress require the Commissioner to make a "finding of fact" on the issue of fraud, as contemplated under sec. 205(b)(1) of the Act.  As described above, sec. 205(u), 1129(l),

29

and 1631(e)(7) all provide for a "reason to believe," a standard recognized by courts in numerous settings as something less than an adjudicated finding of fact. *Standard Oil*, 449 U.S. at 241 ("the Commission's averment of 'reason to believe' that Socal was violating the Act is not a definitive statement of position"); *Fed. Election Comm'n v. Franklin*, 718 F. Supp. 1272, 1279 (E.D. Va.), *order aff'd in part*, *vacated in part*, 902 F.2d 3 (4th Cir. 1989) (review denied when "sought to test the factual sufficiency underlying a reason to believe finding"); *Spannaus v. Fed. Election Comm'n*, 641 F.Supp. 1520, 1529-30 (S.D.N.Y.1986), aff'd mem., 816 F.2d 670 (2d Cir. 1987); *China Nat'l. Mach. Imp. & Exp. Corp. v. United States*, 27 C.I.T. 1553, 1557 (2003), aff'd sub nom. *China Nat. Mach. Imp. & Exp. Corp. v. United States*, 104 F. App'x 183 (Fed. Cir. 2004) ("reason to believe or suspect requires less evidence than an actual finding of subsidies in fact.").

Second, more process in these cases does not equal better process. In fact, the additional procedures Plaintiffs seek will likely have the unintended consequence of making the redetermination process less reliable. ALJs make their decisions on disability claims based on a finite and well-defined record. Here, on the other hand, the evidence of a large-scale fraud scheme necessitates the analysis of thousands of case files and facts outside the administrative record. ALJs have neither the expertise nor the resources to look beyond the circumstances of the particular case before them—therefore, they cannot readily duplicate OIG's investigative functions. Therefore, relying on ALJs to correctly and uniformly determine a "reason to believe" that fraud is involved in a large-scale fraud scheme involving thousands of claimants is simply unworkable. Faced with such obstacles, the agency would be forced with the only other alternative—doing nothing at all.

Moreover, to adopt Plaintiffs' process could be patently unfair.  If similarly situated individuals received disparate decisions based on different factfinders' analysis of the evidence against Conn, ALJ Daugherty, and the medical sources, such a process would defeat the primary purpose of procedural due process, *see Quill Corp.*, 504 U.S. at 312.  By bestowing SSA OIG with exclusive authority to conduct investigations into large-scale fraud schemes perpetrated by third parties, requiring OIG to notify the agency of any "reason to believe" findings resulting from its investigations, and requiring the agency to initiate redeterminations based on those findings, the redetermination process as prescribed by Congress ensures that its programs are administered fairly and uniformly.

> **3.     The Private Interest Affected Does Not Outweigh the Other *Mathews* Factors.**

The third *Mathews* factor is the private interest affected.  On this point, the Commissioner notes that only three of the Plaintiffs in this case received SSI benefits (Blackburn, Hicks, and Adams).  Thus, the heightened private interest recognized in *Goldberg v. Kelly*, is not applicable to the other Plaintiffs.  In any event, the Commissioner notes that all Plaintiffs were provided with ample procedural protections, including the right to hearing recognized in *Goldberg*.  Certainly, Plaintiffs have an interest in having a meaningful opportunity to show they were entitled to benefits at the time they were originally allowed.  *See Flatford*, 93 F.3d at 1306; *Yancey*, 145 F.3d at 113.  The Commissioner submits that this interest was adequately protected by the protections that the agency built in to the redetermination process.  In fact, unlike in *Goldberg*, Plaintiffs have already had hearings.  To the extent that Plaintiffs contend that they were entitled to more process, the Commissioner respectfully submits that their private interest is outweighed by the government's significant interest in preventing fraud and ensuring uniform

administration of its programs and the fact that additional procedures would not decrease the likelihood of an erroneous deprivation of benefits.

    **4.    An Act of Congress is Presumed To Be Constitutional, And That Presumption Is Not Overcome Absent A Substantial Showing That The Redetermination Process Inadequately Protects The Due Process Rights of Plaintiffs.**

An Act of Congress challenged on procedural due process grounds is presumed to be constitutional, and a challenger bears the heavy burden of demonstrating its unconstitutionality. Judging the constitutionality of an Act of Congress is properly considered "'the gravest and most delicate duty that this Court is called upon to perform'" *Rostker v. Goldberg*, 453 U.S. 57, 64 (1981) (*quoting Blodgett v. Holden*, 275 U.S. 142, 148,(1927) (Holmes, J.)). "This deference to congressional judgment must be afforded even though the claim is that a statute Congress has enacted effects a denial of the procedural due process guaranteed by the Fifth Amendment." *Walters v. Nat'l Assoc. of Radiation Survivors*, 473 U.S. 305, 319-320 (1985).

In *Mathews*, the Supreme Court applied a similar presumption of constitutionality in reviewing procedural due process challenges to procedures formulated and applied by SSA. *Mathews*, 424 U.S. at 349.  That deference flows from the recognition that "substantial weight must be given to the good-faith judgments of the individuals charged by Congress with the administration of social welfare programs that the procedures they have provided assure fair consideration of the entitlement claims of individuals."  *Mathews*, 424 U.S. at 349.

Plaintiffs have not demonstrated how Congress's duly-enacted process deprives them of due process.  In fact, as explained above, requiring individual mini-trials in each case would undermine the accuracy and fairness of the process and infringe upon critical government interests.  Moreover, Plaintiffs cannot show how any additional procedural safeguards, other than those already afforded them, will adequately reduce the risk that their benefits will be

erroneously deprived through the redetermination process.  For these reasons, Plaintiffs'

constitutional challenges must fail.

## CONCLUSION

For the foregoing reasons, this Court should grant the Acting Commissioner's Motion for

Summary Judgment in part with prejudice.

Respectfully submitted,


KERRY B. HARVEY
UNITED STATES ATTORNEY


By:     /s/ Amanda B. Gilman
        Special Assistant United States Attorney
        Social Security Administration
        6401 Security Blvd.
        Baltimore, MD 21235


Of Counsel for the Defendant:
John Jay Lee, Regional Chief Counsel, Denver
Meghan Frei Berglind, Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel, Region VIII
1961 Stout Street, Suite 4169
Denver, Colorado 80294-4003


## CERTIFICATE OF SERVICE

I certify that on September 19, 2016, I electronically filed the foregoing with the Clerk of
Court by using the CM/ECF system, which will send a notice of electronic filing to the following
CM/ECF participant, Joseph R. Lane; Kelly Lynn Ward Wallen; Francis E. Budde; Charnel
Marie Burton; and Evan Barret Smith, Counsel for Plaintiffs.

/s/ Meghan Frei Berglind
Meghan Frei Berglind
Special Assistant United States Attorney