IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT PIKEVILLE

*In re* MOTIONS TO DISMISS
Civil Action Nos.

16-53-ART, 16-64-ART, 16-89-ART, 16-95-ART, 16-106-ART, 16-115-ART, 16-154-ART

### ACTING COMMISSIONER'S SUPPLEMENTAL BRIEFING

### INTRODUCTION

In *Hamdi v. Rumsfeld*, 124 S. Ct. 2633 (2004), the Supreme Court expressed its deep concerns regarding the protection of a fundamental liberty right—freedom from arbitrary penal restraint. In light of this, *Hamdi* must be read narrowly to apply only to situations where there is a *liberty* interest at stake; and the government has provided *no due process* protections. These cases are in no way similar. Plaintiffs' liberties are not at risk—no one is being unlawfully detained. Furthermore, Congress has explicitly provided a process, which the agency has followed. Moreover, the agency has provided abundant procedural safeguards, over and above that which Congress required. To attempt to analogize the ample procedural protections provided in these cases to the complete lack of procedure provided in *Hamdi*—as Plaintiffs do (*see, e.g.*, No. 7:16-cv-00106-ART, ECF No. 23 (Pl.'s Br.), at 15-16)—is an obvious overreach. Under *Mathews v. Eldridge*, Plaintiffs have received all process they are due in cases where there is a "reason to believe that fraud was involved." 42 U.S.C. §§ 404(u), 1383(e)(7); *Mathews v. Eldridge*, 424 U.S. 319 (1976). Plaintiffs cannot credibly argue that their interest—in receiving disability benefits immune from the redetermination process prescribed by Congress—is anything like Mr. Hamdi's unchallengeable imprisonment.

**DISCUSSION**

I.      *Hamdi* **Background and Holding**

*Hamdi* involved a U.S. citizen who was captured and detained in Afghanistan in 2001, while allegedly fighting with the Taliban. *Hamdi*, 124 S. Ct. at 2635-36. The government contended that, because Mr. Hamdi was an "enemy combatant," he could be held indefinitely without formal charges or proceedings and without access to counsel. *Id.* at 2636. After Mr. Hamdi's father filed a petition for writ of habeas corpus, the district court ordered that counsel be given access to Mr. Hamdi. *Id.* The Fourth Circuit reversed and directed the district court to "consider the most cautious procedures first," stating that the detention would be lawful if Mr. Hamdi was an enemy combatant. *Id.* On remand, the government submitted a motion to dismiss, which was supported by a declaration describing Mr. Hamdi's affiliation with the Taliban. *Id.* at 2637. While the district court found this declaration insufficient to support Mr. Hamdi's detention, the Fourth Circuit reversed, holding that he was not entitled to a factual inquiry or evidentiary hearing, given his status as an enemy combatant. *Id.* at 2637-38.

The Supreme Court reversed the Fourth Circuit, holding that, while the detention of citizen enemy combatants was lawful, Mr. Hamdi was still entitled to some measure of due process to dispute his enemy combatant status. *Id.* at 2640, 2646-50. Applying the *Mathews* factors, the Court recognized that Mr. Hamdi's private interest was "the most elemental of liberty interests—the interest in being free from physical detention by one's own government." *Id.* at 2646. The court also recognized that "the risk of erroneous deprivation of a citizen's liberty in the absence of sufficient process . . . is very real," and that "weighty and sensitive government interests" were involved. *Id.* at 2647-48. Balancing these factors, the Court held, "[A] citizen-detainee seeking to challenge his classification as an enemy combatant must receive

notice of the factual basis for his classification and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker." *Id.* at 2648. The Court continued:

> 'Parties whose rights are to be affected are entitled to be heard, and in order that they may enjoy that right they must first be notified.' It is equally fundamental that the right to notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.'

*Id.* at 2649 (quoting *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972)). The Court also recognized that the proceedings could be tailored to "the exigencies of the circumstances." *Id.*

## II.   *Hamdi* Does Not Control the Current Cases

The *Hamdi* Court's ultimate holding is explicitly limited to "citizen-detainee[s]." *Id.* at 2648. Beyond that holding, the decision fundamentally reaffirmed the importance of the *Mathews* factors, *id.* at 2646, and did not create a bright line rule about the amount of process that should be provided in every case. Thus, the requirements of due process remain "fluid and fact dependent" after *Hamdi*, *Showmaker v. City of Howell*, 795 F.3d 553, 559 (6th Cir. 2015), and that decision does not dictate any particular result when resolving the question of what process was due Plaintiffs here.

*Hamdi* has limited applicability to this case because the balancing of the *Mathews* factors is fundamentally different. While *Hamdi* involved the "most elemental of liberty interests," 124 S. Ct. at 2646, the interests implicated here are property interests, arising out of statute.[1] *See Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577-78 (1972) ("Property interests, of course, are not created by the Constitution. . . . Thus, the welfare recipients in

---

[1] Because only three of the individuals here received SSI, benefits, the other four individuals cannot claim the heightened interests in continued receipt of their benefits that was recognized in *Goldberg v. Kelley. See Matthews*, 424 U.S. at 424 (1976) (distinguishing DIB beneficiaries from welfare recipients, holding that claimants of "modest means and outside resources" need not be protected by the stringent standards of a pre-termination hearing).

3

*Goldberg v. Kelly* . . . had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them." (citation omitted)).  Plaintiffs' statutorily-derived property interest in continued benefits cannot be equated with the fundamental liberty interest involved in *Hamdi*.  *See Leocata ec rel. Gilbride v. Wilson-Coker*, 343 F. Supp. 2d 144, 151 (D. Conn. 2004) (finding that *Hamdi* did not apply in cases where Medicaid limited benefit payments to certain facilities); *see also Bennett v. Chertoff*, 425 F.3d 999 (D.C. Cir. 2005) (noting that the *Hamdi* Court "emphasized that physical liberty is a fundamental right that must be accorded great weight" and stating that it was "far from clear that the Court would strike the same balance in the context of employment termination").

The government interest in the balance here is compelling—namely, addressing fraud and ensuring the uniform application of the agency's programs.  The Commissioner acknowledges that this interest is less weighty than the national security interest at stake in *Hamdi*.  But in *Hamdi*, the risk of erroneous deprivation was significant because Mr. Hamdi was offered no process whatsoever—the government claimed the right to detain him without counsel and without notice of the charges against him.  125 S. Ct. at 2636.  In contrast, the risk of erroneous deprivation here is small because Plaintiffs have been given significant process—both prior to and after the termination of benefits.[2]  The Commissioner submits that the lower interests

---

[2] The remote possibility that there may be an actually disabled individual whose only evidence supporting a claim for disability was the disregarded medical opinion does not necessitate greater procedural protection.  "[T]he fundamental fairness of a particular procedure does not turn on the result obtained in any individual case." *Walters v. v. Nat'l Assoc. of Radiation Survivors*, 473 U.S. 305, 321 (1985).  In any event, in these seven cases, there were significant other medical records in the administrative transcript from which to judge the Plaintiffs' entitlement to disability at the time it was originally awarded (Adams Tr. 322-537; Blackburn Tr. 289-504; Hale Tr. 217-596; Hicks Tr. 313-811; Jenkins Tr. 244-384; Justice Tr. 264-829).  And Plaintiffs do not have standing to assert hypothetical due process violations on behalf of non-parties. *See Powers v. Ohio*, 499 U.S. 400, 410-11) (stating that litigants only have standing to assert

favoring the other two factors illustrate how *Hamdi* is of limited usefulness when evaluating what process was due in these cases.

Indeed, another key distinction between these cases and *Hamdi* is the level of process provided. While Mr. Hamdi received no process, the Commissioner provided Plaintiffs with numerous procedural protections. Prior to the termination of benefits, Plaintiffs appeared at a new hearing before a neutral decision maker; had the opportunity to testify and submit new, material, and time-relevant evidence; and were offered assistance with developing additional records that were new, material, and time relevant (Salzmann Decl. (*available at Adams*, ECF No. 24-1), ¶ 6).[3] These procedures gave Plaintiffs ample opportunity to establish they were disabled at the time of the original decision—all of which occurred prior to the termination of benefits. And when the ALJ decided their cases unfavorably, Plaintiffs had the opportunity to seek further administrative review by the Appeals Council—again prior to the termination of benefits.

Moreover, Plaintiffs have significant procedural protections after the termination of benefits. Plaintiffs had the opportunity to seek judicial review of the ALJ's non-disability finding in this court. In the meantime, Plaintiffs may file a new application.[4] If the application is approved, benefits will be restarted. And Plaintiffs may request that overpayments be waived.

---

rights of third parties when three criteria are met: (1) the litigant has an injury in fact giving her "a sufficiently concrete interest" in the outcome; (2) the litigant has a close relation to the third party; and (3) there is "some hindrance" in the third party's ability to protect his own interest).

[3] In addition, prior to offering a new hearing, the Appeals Council reviewed each case to determine if there was sufficient evidence to support the original disability finding. For those individuals whose existing case records supported the original finding—approximately 14% of the referred cases—benefits were continued (Salzmann Decl., ¶ 4).

[4] The outcomes of Plaintiffs' subsequent applications—to the extent that they made them—are described below at pp. 8-9.

These post-termination procedures significantly minimize the potential adverse effect of an erroneous termination of benefits. Indeed, for the (hypothetical) actually disabled person who could not establish disability absent the disregarded evidence, these procedures provide for the receipt of future benefits free from overpayment collection—precisely the relief to which Plaintiffs claim they are entitled (*id.*, ¶ 7). Plaintiffs cannot credibly assert that these procedural protections are equivalent to nonexistent process given in *Hamdi*.

Plaintiffs claim similarity to *Hamdi* because they cannot challenge the triggering event for the redetermination process—that there was reason to believe that fraud or similar fault was involved in the initial benefits decision. But that comparison is inapt. Mr. Hamdi had a right to challenge the facts underlying his classification as an enemy combatant because that classification conclusively determined whether his detention was lawful. *See Hamdi*, 124 S. Ct. at 2640 ("There is no bar to this Nation's holding one of its own citizens as an enemy combatant."). Here, the reason to believe that fraud or similar fault was involved conclusively determined nothing. The relevant statutory provisions do not permit the termination of an individual's entitlement to benefits based solely on the "reason to believe" criterion; instead, that "reason to believe" merely justifies the initiation of the redetermination process. 42 U.S.C. § 405(u), 1383(e)(7).

In other words, the "reason to believe" standing alone could never result in the termination of benefits. Rather, the finding that an individual was not disabled—made only after the opportunity to present evidence and be heard—results in the termination of benefits. Indeed, approximately 47 percent of claimants caught up in Conn's fraud scheme have been found to be disabled under the procedures that Plaintiffs claim are insufficient (Salzmann Decl., ¶ 5). A 47 percent approval rate is wholly consistent with the agency's overall hearing level approval

rate of 45 percent. *See* Limitation on Administrative Expenditures (Oct. 2015), at p. 143, *available at* https://www.ssa.gov/budget/FY16Files/2016LAE.pdf (last accessed Sep. 30, 2016). These statistics further confirm that Plaintiffs did not lose their benefits because there was reason to believe fraud was involved in the initial ALJ decision or because certain evidence was disregarded. Plaintiffs lost their benefits because their claims of disability were not supported by the overall evidentiary records in their cases, including any new evidence they provided.[5]

*Hamdi* has been overwhelmingly applied in cases with similar factual backgrounds (i.e., cases involving enemy combatants, national security, or government detentions). *See, e.g.*, *Boumediene v. Bush*, 553 U.S. 723 (2008); *Vance v. Rumsfeld*, 653 F.3d 591 (7th Cir. 2011). When applied outside that context, the case has not been read to dictate a particular procedure. For example, in *Bailey v. Mutual of Omaha Ins. Co.*, 534 F. Supp.2d 43 (D. D.C. 2008), a case involving the due process rights of Medicare Part B beneficiaries, another district court cited *Hamdi* for the general proposition that "'notice and opportunity for [a] hearing appropriate to the nature of the case' are the essential requirements of due process." *Id.* at 54 (citing *Hamdi*, 124 S. Ct. at 2633). But that court went on to state that there was no due process violation when there was a "meaningful post-deprivation remedy," and found that the plaintiff's due process rights had not been violated. *Id.* at 54-55. In another example, regarding termination of government employment after revocation of the employee's security clearance, the D.C. Circuit noted that *Hamdi* "does not unsettle" preexisting due process precedent and noted the difference of the

---

[5] Ms. Hicks, whose application was discussed specifically by Plaintiffs' counsel at the recent hearings, case is particularly instructive. While it was implied at hearing that Ms. Hicks had disabling mental impairments, the records in her case paint a different picture. They show Ms. Hicks have no mental health treatment during the period at issue, that she did not report that she had a mental symptoms when establishing care with an internist, and that opinion evidence indicated she had no more than minimal limitations.

interests involved before dismissing the plaintiff's due process complaint. *Bennett*, 425 F.3d at 1004. Thus, this Court should not read *Hamdi* to control the resolution of Plaintiffs' due process claims.

### III. Status of Plaintiff's Subsequent Applications

As discussed above, the numerous procedural protections available to Plaintiffs make their cases distinguishable from *Hamdi*. Two of the available post-termination procedures—the ability to seek a waiver of any overpayment and the ability to file a new application—work together to minimize any harm to individuals in the unlikely event that an actually disabled beneficiary cannot establish that she was disabled at the time of the original allowance. In such a case, an individual could request a waiver of the overpayment provided that she was without fault and repaying the overpayment is not "against equity and good conscience." *See* 42 U.S.C. § 404(b) ("In any case in which more than the correct amount of payment has been made, there shall be no adjustment of payments to, or recovery by the United States from, any person who is without fault if such adjustment or recovery would defeat the purpose of this title or would be against equity and good conscience."); *see also* 42 U.S.C. § 1383(b)(1)(B); 20 C.F.R. §§ 404.501-.502a, 404.506-.512, 416.537-.538, 416.550-.590. And by filing a subsequent application for benefits, that individual would be entitled to receive disability benefits (provided that she met the SSI resource requirement or was still insured for DIB purposes at the time her disability began). Taken together, these two protections protect an eligible person from the erroneous deprivation of benefits that is at the heart of Plaintiffs' due process challenges.

Notably, however, some of these Plaintiffs have failed to take advantage of the process available to them. Three of them—Linda Blackburn, Cherrie Justice, and Amy Jo Hicks—have so far not filed new applications (*see* Exhibit 1, Declaration of Nancy A Clark (Clark Decl.),

¶ 5), despite the fact that they were informed of their right to do so when they received unfavorable ALJ decisions and were represented by counsel at the time of that notice (Blackburn Tr. 11; Justice Tr. 9; Hicks Tr. 8).  The subsequent applications that Leah Jenkins filed on March 8, 2016, were denied because the evidence did not establish that she was disabled currently or at the time of her date last insured (Clark Decl., ¶ 2).  Roy Hale filed new applications on March 17, 2016; his title II application was denied because he was not disabled as of his date last insured, and he has not received a decision on his title XVI application, which considers whether he is currently disabled (Clack Decl. ¶ 3).  And Sheila Adams, who filed a new application on September 2, 2016, has not yet received a decision (Clark Decl., ¶ 4).[6]

## CONCLUSION

*Hamdi* does not dictate a particular procedure, but instead reaffirms the importance of a case-specific application of the *Mathews* factors.  As discussed in detail in Defendant's Cross-Motion for Summary Judgment, a careful weighing of those factors supports one conclusion:  the procedures provided by the Commissioner in these cases more than satisfied due process.  Thus, the Commissioner respectfully requests that the Court grant its motion for summary judgment and deny Plaintiff's cross-motion.

---

[6] The final claimant—Patricia Ousley—is deceased and could not have filed a new application.

                                        Respectfully submitted,

                                        KERRY B. HARVEY
                                        UNITED STATES ATTORNEY

                    By:    *s/ Meghan Frei Berglind*
                           Special Assistant United States Attorney
                           Social Security Administration
                           Office of the General Counsel, Region VIII
                           1961 Stout Street, Suite 4169
                           Denver, Colorado 80294-4003
                           (303) 844-2544
                           meghan.berglind@ssa.gov

                           Amanda Gilman
                           Special Assistant United States Attorney
                           Security Administration
                           6401 Security Boulevard
                           Baltimore, Maryland 21235
                           amanda.gilman@ssa.gov

Of Counsel for the Defendant:
John Jay Lee, Regional Chief Counsel, Denver
Social Security Administration
Office of the General Counsel, Region VIII

## CERTIFICATE OF SERVICE

      I certify that on September 30, 2016, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to the following CM/ECF participant, Joseph R. Lane; Kelly Lynn Ward Wallen; Francis E. Budde; Charnel Marie Burton; and Evan Barret Smith, Counsel for Plaintiffs.

                                        *s/ Meghan Frei Berglind*
                                        Meghan Frei Berglind
                                        Special Assistant United States Attorney